v. Vestavia Hills Board of Education Good morning, counsel. Good morning. You may proceed. Thank you. May it please the court, my name is Charles Greer. I represent the appellant Anita Smith. And between the time that the final briefs were submitted in this case and argument, important cases have been handed down by this court that bear very heavily on the issues raised in this case, primarily Lewis v. City of Union City dealing with the proper comparators. And so that is an important issue that we need to talk about this morning, but this case also raises, I think, a question that's been floating around the courts of appeals since 1991, perhaps. And that is what has been the effect of the 1991 amendments to the Civil Rights Act of 1964, in particular the impact on McDonnell Douglas and how do we understand McDonnell Douglas and its progeny in light of those amendments. And let me first give a little, I'm sure the court is somewhat familiar with the history of those amendments, but McDonnell Douglas was decided 50 years ago, approximately 50 years ago. I think we know all of that. Yeah, I was just starting to practice then and it has served well for a substantial period of time to help organize the evidence. But the 1991 amendments made very significant changes and these changes, appellant contends, the district court judge did not recognize in granting summary judgment in this case. But even if McDonnell Douglas is applied in this case, that the district court erred by . . . Well, is this a single motive case or is it a mixed motive case? This is a mixed motive case. And . . . Your complaint suggests that it was a mixed motive case? Our complaint doesn't say one way or another other than that it indicates that there was a tardiness issue involved with a number of the employees there and that she was terminated, which we believe was her race. And that under the motivating factor test, the statute makes it clear that it would be a violation of the law if race was a motivating factor, even if other factors were involved in the decision. And what that really means by statute is that in any case where race is a factor and there's some other . . . Let me ask the question this way, did you argue in the district court this was a mixed motive case? Yes, we did. Okay. Yes, we did. We did make that argument. And the court rejected it and it's hard to tell from exactly what the court did, but . . . How did you express, articulate that argument before the district court? How did we articulate it? We set it out by saying that this is what the statute requires, it's a motivating factor test under the 1991 amendments and that we can meet that standard. The court . . . My impression was that you went through the McDonnell-Douglas analysis and that the district court would have assumed that was the approach you were taking based on your briefing. Well, the McDonnell-Douglas analysis, which is merely a procedure for managing the evidence, is not a statutory requirement. I'm just talking about what the district court looks for signals. Right. And they read your brief and say, and if you never articulate the mixed motive standard or make that argument, but instead your briefing is dealing with McDonnell-Douglas, understandably the district court has no notion that you're going under a mixed motive theory, correct? Well, we did argue motivating factor. We've never used mixed motive. Mixed motive is not the language of the statute, so we used motivating factor. But McDonnell-Douglas is not irrelevant in a motivating factor case. And that's because under McDonnell-Douglas, the plaintiff in a prima facie case . . . Right, but we held unambiguously in Quigg that the McDonnell-Douglas standard obviously continues to apply in a single motive claim or case. But that framework does not apply to a mixed motive claim. So if this is a mixed motive case, we would analyze it in a somewhat different way, right? Yes, somewhat different way. Right. The district court took it as a single motive case, not a mixed motive case. She took it, the district court took it as a circumstantial evidence McDonnell-Douglas. But circumstantial evidence could apply whether the claim arises under a single motive theory or a mixed motive theory, right? The fact that it's circumstantial doesn't really tell us whether you're traveling on this theory of liability or that theory of liability. And after Desert Palace, that's correct. Right. So tell me why the district court was wrong to analyze this as a single motive case and why the analysis itself, the conclusion it reached, was wrong under a single motive McDonnell-Douglas approach. Okay, I'll start with the McDonnell-Douglas approach. Because the district court found that Ms. Smith failed to establish a prima facie case. And in making that determination, she sets out the law and cites a case called Benjamin at great length. I think she quotes, the district court quotes Benjamin, it goes over a page and one paragraph, to say this is what the standard is. What she excluded from that quote, in the middle of that quote is a footnote, it's footnote three in Benjamin, that sets out what you must prove to establish a prima facie case under McDonnell-Douglas in a discharge case. And the elements set forth in footnote three in Benjamin from this court, you have to prove you're a member of a protected class, Ms. Smith was African American, qualified for the job, she was doing the job and had got meets or exceeds evaluations, she was discharged, she was replaced by someone outside the protected group, she was replaced by Ms. Hicks, a white woman. There's no question that Ms. Smith and the evidence met the Benjamin standard. The court didn't cite that standard, however, it set forth the standard from a failure to promote case, which said that she had to prove something different. Then, to somewhat maybe presaging what Lewis was going to do, said you have to show a comparator as part of a prima facie case. And of course, comparator evidence is one way to show a prima facie case, it's not the only way, it's not the only way also to survive summary judgments, because there's the quote mosaic of circumstantial evidence, numbers of different ways. But then even applying the test she said about comparators, she misapplied the comparator analysis by saying Ms. Smith could only compare herself to a person who did not have the same record of violations of the rules and ignored the white people who had violated the same  Our ruling in Bonk v. Lewis said that we define the comparator who is similarly situated in all material respects. Applying that here, it seemed to me, and you can help me if I've misapprehended this, that the only other secretarial employee whose desk had to be staffed at all times during her working hours was Connie Thomas, and that therefore Connie Thomas would be the appropriate comparator for Smith. But the problem there was that there was no evidence that Thomas had any tardiness issues. What am I missing insofar as I lay it out that way? Well, I'll end with your first point, because I believe the decision in Cornell v. Brennan, 775 Federal Appendix 630, from this court over the summer of 2019, spoke specifically this question where Mr. Connell, who was being forced to wear a uniform under the regulations of the Postal Service, was complaining that the women didn't have to wear a uniform and he was being criticized and they were not. And leaving aside the court found he hadn't suffered a materially adverse action, the court made it very clear that was an improper comparison because the women had not engaged in the same conduct, i.e., they weren't wearing the uniform. And so that's an improper comparison and cited Lewis for that proposition. So in looking at Lewis, there are factors that were identified. First, general guidelines. So tell me who the proper comparators are here. The proper comparators are exactly what the factors are identified in Lewis. Those who have engaged in the same misconduct. No, I understand the law. I want you to tell me specifically who, give me the names. Nancy Smith, who never showed up on time for over one year. Tracy Towns, a receptionist who also had serious absentee issues. And then Ms. Hicks, who was hired as an aide to cover the front desk and was tardy. And there's some material issues, in fact, in dispute about what her reporting time was. It was 7 o'clock, says her supervisor. She says it was changed. But you have to resolve those facts in favor of Ms. Smith. Those three had attendance records that were significantly worse than Anita Smith's. They were all white. They were subject to the same policy. The principal, in fact, had held a meeting and advised everyone there they are expected to show up on time, no exceptions. And did their job require them to be staffing at all times during working hours at the desk? Well, this is where. And you may say the answer is no, but it doesn't matter. Well, but that is a distinction, is there not? That's the distinction the defendants have made. And that is where the importance of the motivating factor distinction becomes in. Because under McDonnell Douglas, because in Lewis the court ultimately resolved that you have to put comparators in your prima facie case, that presupposes the plaintiff must anticipate what the legitimate non-discriminatory reason is that's going to be articulated at the second stage. And it's not for the plaintiff to articulate what that reason is, but that's where we are in Lewis. So Ms. Smith demonstrated whites who had the same attendance problems were disciplined this way. Now, the defendant came forward either as a legitimate non-discriminatory reason, which they only have to articulate and saying, yeah, but their jobs were different, to which plaintiff would have the right to show pretext. Court never got to pretext. But under the motivating factor standard, once Ms. Smith showed there are whites who are as absent or tardy as I was and not disciplined, that is the definition of discrimination, treating similarly situated people differently. They may have a reason to say, yeah, but there was another factor we also considered, not just your tardiness, but the importance of your job. That makes it mixed motive, motivating factor. And they Does it matter, does it matter that after the plaintiff got her evaluation and said, you know, you need to work on this, this is important, we want deaths to be manned, that nonetheless she was late 10 out of the 13 days following her performance evaluation? It does not matter. And why is that? When you look at her tardiness, it's typically less than 10 minutes. And she is late and she's working on it. Boss is telling you, look, I'm tired of having the parents out there. You're not there to man the desk. This is becoming a real problem. And her reaction to that is to continue to be late. Well, she is late. She's tardy. He doesn't say the same thing to any of the white people that he evaluates on that very same day. And in fact, for the woman who never showed up more than an hour late for 357 days, he listed under attendance reliable. Now, what we've got is a very different standard being applied to Miss Smith that is being applied to any of the white individuals. I see my time is up, but the district court, I think, got it wrong in terms of the comparison. The comparative analysis has been rejected by this court in the Connor case, the one that the defendant, the appellee is advocating. And we would suggest that the case needs to be reversed and remanded for at least review and in light of Lewis. Thank you very much. Thank you. May it please the court. I'm Mark Boardman together with my partner, Kate Watkins. We represent the Vestavia Hills School District, which is right outside Birmingham, which the principal, one of the principals involved with my kids' teachers and Kate's kids will be going to that high school. And representing us for the high school and the school system is the superintendent, Dr. Todd Freeman. The issue here with regard to mixed motive, let me start out specifically with that, because the key on this case is when someone is absent, tardy, she showed up, but she is tardy 87% of the time, i.e. only present over two years, on time 13% of the time. When they all walk through the same door of the high school to come in, the students and the educators, all employees, then that's a problem. And under Alabama law, the way we operate things is everybody employed by the Board of Education can have tenure after three years of employment. You've got lifetime employment if you survive three years, whether you're a janitor, a secretary, a teacher, all those employees are going to be entitled to tenure. So the Board of Education in an education in Alabama, we generally hire for one-year periods. It's just difficult to terminate, although it's possible, a probationary non-tenured employee during the one year, during the school year. So you employ them one year, you keep them a second year. If you keep them a third year, you've got them forever. So we talk about firing and termination, but it's actually non-renewal is what we talk about in the concept, because we don't keep somebody, didn't invite her back for the third year. And we gave her plenty of time. She's paid through the end of the academic year. So you're saying anyone with tenure is not a comparator because the standards are understandably going to be slacker for those people, but you're really tough on the brand new employees? Yes, ma'am. Your Honor, you have to be that way because otherwise you're stuck with them technically for your life or theirs, one of the two, however long you're going to be in that system. So when you look at it . . . If somebody was late 87, if we had the same employee that has tenure, you wouldn't have been able to fire that person? You probably would have been able to fire that person, but it's a much more difficult process. You're going to give them all hearings regardless because . . . I mean, not for non-renewal. You don't have to give a hearing under Alabama law, but if you were going to terminate someone either mid-year or not invite them back to the next year after they're tenured, you're going to have to go through a due process hearing, a louder mill hearing essentially, and then that is subject to potential appeal at the circuit court level and all the way up to the Alabama Supreme Court. Big, big difference, real expensive process. Essentially, if you get tenure in Alabama, you're going to be there for the rest of . . . as long as you want to continue to work. But if you're late that often, think of the story we're trying to send students. They're all walking in the same door. The reason they're walking in the same door is there's no separate employee entrance because Alabama's code red law requires us to have only one door that you can get in and out. All the other doors are locked from the outside. So everybody walks in. All the students walk in the same door that she's walking in late for. Now, if these students are tardy, we will send them to alternative school. We'll take some type of action against them. We're trying to teach them you do not need to be tardy. Even if she comes in, if she comes in late with them, she's walking in with them, if she comes in late and she's not there, they've already walked by her desk to get to their classes. So it's a very, very important issue. Now, let's talk about the . . . we started out with mixed motive. So I want to start in that area. Before we get to that question, did the plaintiff in this case tell the district court at some point in the proceedings that this was a mixed motive case rather than a single motive case? We don't think so. Here's why. It's two sentences in their brief. They only say motivating factor. They do not end arguing about the continued viability of McDonnell Douglas' paradigm in assessing evidence and citing the quid. And that's on document 43, page 32-33. The . . . they didn't . . . there's no . . . there's never the word mixed motive in any of that. There isn't even the word mixed motive in the statement of issues that's before you today from their brief. They don't list mixed motive at all. If you look at the issues they presented, they . . . three of them are really pretty much the same. Does the 1991 amendments apply to McDonnell Douglas? Still applicable. That's one, three, and five. And then number four is the age discrimination issue. And number six is did the court err in the summary judgment stage by resolving factual suits in favor of the movement by viewing the light most favorable to the movement? So that's not even here really on the brief. When . . . I mean, this is a fundamental fairness. How are we supposed to know what we're supposed to argue? And more importantly, how is Judge Hopkins supposed to know how she's going to analyze it when in their brief they're talking McDonnell Douglas? And when in their brief they don't mention mixed motive? Let me ask you this question. At what point in the proceedings is a plaintiff obliged to fish or cut bait and indicate that she's proceeding under mixed motive rather than single motive? Do you know the way I want to answer that? Enough that you don't have to. You certainly can't say the complaint alone must indicate that. Price-Waterhouse makes clear you wouldn't say that at the complaint stage. So at what point does a party have to notice a court? We don't really answer that question in Quigg. But there seems to be considerable confusion in the district courts when that die has to be cast and how. What's your view on that? Well, I'd like you all to say it has to be in the complaint, but I don't think you're going to do that. I understand the part from Price-Waterhouse that says you can raise it essentially in your reply brief. But gee, golly, raise it in your reply brief to the motion for summary judgment with more than two sentences and use at least the word motivating factor so that not only the court but also the defendant in filing that reply brief to the motion for summary judgment knows what's going on. Right. So your view is that at least at the stage of summary judgment, the plaintiff's got to make clear if she's proceeding under a mixed motive theory. Which is exactly why we included a defense in our answer. They say that that gave us that we were on notice that we were using mixed motive because we used defense in our answer. We put it in every of our answers. It says regardless of the reason there was actual grounds for terminating her, legal grounds for terminating her, because I mean, I use it in this situation. I don't know when the complaint is filed and the time we get to trial what the status of the plaintiff is. She may win a Nobel Prize between now and then. But my argument would be to the jury, and that's what I want to be able to preserve, that when she's late 87% of the time, it doesn't matter that she's won a Nobel Prize since we terminated her. We still can't have somebody who's not there on time. So that leads me to the issue of let's look at the comparators. The comparators they list, to begin with, as this court said, I mean, as the trial court said, there was one comparator. And that's the only other person in the school, on the secretarial staff, that has to have a desk manned at all time. At lunch, on separate hours, from hours to hours, et cetera, no other desk is that same way. So using the language from Lewis, we've actually found a unicorn of a doppelganger here. And that doppelganger is someone who worked at a little bit different hour. So when her, she actually started at 745. So when the plaintiff- Talking about? Connie Thomas. So there's two. See what Connie Thomas did is she handled check-ins and check-outs. So if you show up late for school or your parent has to check you out, that's why they kept her from 745 until 345. On the other hand, the plaintiff was the one who answered the phone. All phone calls go to her desk. She had to be there at 7 o'clock. All parents have to go to her desk unless they're showing to check in or check out. We have a whole list of things that she actually was responsible for, in addition to all vendors- You say she's the only comparator, but opposing counsel argues that all these other folks that had tardiness issues as well should also be considered comparators. Why do you say no to that? Well, because y'all say in, when you, in the assembly situated in all material aspects, y'all are very specific about that. Y'all say that they all have to be subject to the same employment policy guideline or rule as the plaintiff. Well, that's the only desk that had to be fully manned. Additionally, there are other distinctions that do not make them doppelgangers to a unicorn. For example, the first person they talk about, Nancy Smith. Nancy Smith was a tenured employee who was dying. Under the Americans with Disabilities Act or any modicum of sympathy, it was very cruel to say, hey, we're going to terminate you as you are dying. And she did die. That's in the record? It is in the record. Yes, ma'am. In other words, they were kind to her for lateness or whatever because she was ill? You're not going to find kindness in there. You're going to find that she is late and that she, that she ended up with, because she was sick and because she, and then she ended up dying. That's where her position came open. Then there's, and she does not work in the same area. She works under a different supervisor. She's actually a bookkeeper. She doesn't even work in that same area. And she's got a different supervisor. The next person they want to argue is Tracy Towns. Tracy Towns, number of differences. First, different supervisor. She's late. There's no doubt about that. She's late. Different supervisor, different location. She's down the hall and around because she works in the guidance department. Number three, her desk did not need to be covered at all times. Very, very clear. She goes to lunch, wherever she goes. She doesn't have to have somebody sit in her position. On the other hand, if the plaintiff wanted to even go to the bathroom, she had to have somebody covering her desk because somebody has got to answer that phone and somebody has got to greet those visitors and parents when they come into the school. Somebody has got to be the person that is the face of the school. And that's what her role was. And the fourth distinction is she notified her supervisor when she was late. And she explained why she was late. Why she was late was because her father was suffering from a disabilitating disease. Her father, she was the only child in town. You're talking about Tracy Towns still? Tracy Towns. All right. Yes, ma'am. And that sick parent passed away. After that sick parent passed away, she didn't have those problems with tardiness anymore. How about Ms. Hicks? Ms. Hicks was very, very different too. Ms. Hicks, to begin with, was not late. Here's why they say she's late. The interim principal said, well, I think her hours are from 7 to 3. But that's accurate only during the first week as we established on the record, in the record, without dispute from the plaintiff, her hours were changed on the second week of her employment in that school year from 7-20 to 7-3-20. And at that point, then she is, she is not tardy. So there's a huge, huge difference there if you look at it from that standpoint. Then the other thing in regard to Ms. Hicks. How long had Ms. Hicks been an employee? How long had she been an employee? Ms. Hicks was a, October of that second year, let's say. So Ms. Hicks also, in addition to that, is not an interested witness. She ended up getting a position on the recommendation of the guy who taught my kids, when he was a teacher, now he's a principal, to be put in this position. He did not know at the time, because that goes to the failure to hire claim. He did not know at the time of the EEOC claim. In fact, none of those two positions that they talk about, the one they've continued in the brief, which the judge, they abandoned, and the one that we have articulated and that the judge actually dealt with, that person who made that recommendation didn't even know about the EEOC claim. And that's one of the other unique things about getting hired in Alabama by this Board of Education. What you do is you apply to that school and that principal then makes that recommendation. It's a different principal who made these recommendations from the principal who was in charge of the plaintiff at the time. Then that recommendation goes up to the superintendent. The superintendent has to make that recommendation, which generally is a rubber stamp. And then it goes to the Board of Education for actual approval. So there's no evidence any of those other individuals knew that that was even there. So, bottom line, at this point, we're talking about somebody who is absent a majority, 87% of the time. Again, it does not matter if she is a Nobel Prize laureate. When you have a unicorn to a doppelganger who is the exact same person in the exact same circumstance who was there all the time, by the way, that employee ended up being ultimately was non-renewed also for different reasons, but it was in the next year after that. Then we've met the new standard in Lewis v. City of Union City and we're substantial material in all respects. And for that reason, there's no discrimination. The evidence of discrimination, even if you apply their mixed motive theory, is that she was the only African-American who was terminated. But that's no more the law that evidence is than she cannot be terminated because she's the only African-American employee. There's got to be some type of, as you said in Quigg, there's got to be some evidence of some type of race or age or whatever the protected category is that motivates this action, and there's simply no evidence there. They abandoned their hostile environment claim. There's no evidence that anybody who was in the supervisory capacity even knew that she claimed she had some type of problem. So overall, the court just, whatever standards you apply, even if the mixed motive standard applies, then she's still not, she's not met that standard either. The remainder of the argument deals with McDonnell Douglas and whether that's the accurate standard. And I'm not going to presume to say that, I don't know how we've missed it since 1991 that that shouldn't be the standard, but the Supreme Court continues to use that. Y'all continue to use that in Lewis v. Union City. McDonnell Douglas, unless the law changes, has been the standard, and we argue that for that reason, everything Judge Hopkins got was correct, and we ask that you affirm her decision. Thank you very much. A number of points. With regard to the 87 percent absentee rate, I believe the district court judge concluded that there was no evidence to support that figure. That merely was the principal's guesstimate, and she permitted that testimony to come in not for the truth of the matter, but for what he believed was correct. But we do not doubt that she was tardy. We just question the continuity. Can't somebody go back through the records, kind of figure that out? We could, and I believe our summaries that we submitted, we went through only and identified the days when she was tardy. And so if the number wasn't 87 percent, in your view, what was it? It may have been 50 percent. It may have been 45 percent. I didn't do those numbers. It certainly wasn't the 100 percent of Nancy Smith. Here's my practice, leaving aside case law and all that practical. You're the principal. You really don't want to hear parents and people angry outside because the person at the desk is not there. There's a lot of clatter. And you talk to the employee and say, look, number one thing, you've got to be here. You've got to be here, and you're late all the time. And after you talk to that employee, 11, 10 out of the next 13 days, she ignores that directive. I'm not saying it's purposeful insubordination, but what you do, particularly given the fact that once she gets tenure, you're not going to have any leverage at all, what is the principal supposed to do in that situation? It is a problem. And of course, one would expect, because her job was so important, that in September when she was hired, instead of having a general meeting and saying everyone is expected to be here on time, he just sat down with her and said, now it's particularly important that you be here on time. Maybe a better manager would have done it incrementally, but she was spoken to and said, this is it. In April. All right, and she had all those days to show she got the message, and she didn't get the message. Okay, and she's the only person spoke to. And let's look at that. So Nancy's or Anita Smith should be there when a parent shows up at 7 o'clock and says, I want to talk to the guidance counselor. So her job is to assist that person and say, you go down the hall, go down here and go to that desk. Now, the guidance counselor whose secretary who's supposed to be here at 7 o'clock, don't worry, she won't be here till 845. Okay, what is she supposed to do when they talk about who must be there, being there to help parents? But given all the issues we now have with these violence and shootings at schools, isn't it really important that an adult figure at the door be there to monitor who's coming in and out? There was an adult figure at the door. They admit that if she was tardy, sometimes she was there early. If she was late three, four minutes because of traffic or who knows what, sometimes because of weather. There were people there. The principal was there. The principal's secretary was there. There were people there to make certain there was no problem. And in fact, I think they described that her office was behind a wall and a door. So it wasn't out in the lobby. It was behind a wall and a door. So it's important. But the question is, is that their legitimate, non-discriminatory reason? Is it a factor other than her race? Because clearly they're under the same policy. Just a few things with regard to tenure. Well, you're almost out of time. I think you are out of time. So we'll give you one last word, counsel. With regard to the tenure question and this problem, Miss Towns tardy 138 times in 10 months was granted tenure. So here she was. She was approved for her third year and gets tenure. And there's no evidence in the record that Nancy Smith requested an accommodation under the ADA, flexible work hours under the FMLA. That is all argument of counsel. Thank you very much. Thank you, folks. We'll move on to the